[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION CONCERNING MOTIONS FOR EXTENSION AND REVOCATION
This case involves the interests of Steven M. and Francis (hereafter "Frankie") M., minors who were committed by the court to the custody of the Department of Children and Families as neglected and uncared for children on August 31, 1998. The children's divorced parents, Francis M. and Wendy M., are the respondents in the neglect proceeding.
Counsel for Wendy M. filed motions to revoke commitment, to reopen judgment, and to modify court expectations on December 29, 1998. DCF subsequently filed motions for the extension of each child's commitment. The matters pertaining to the respondent's motion to revoke commitment, and the petitioner's motions for extension, were consolidated for trial before the undersigned.[1] The evidentiary hearing on these motions was held on May 7, 1999 and July 26, 1999.
The respondent parents were present throughout the proceeding, and were assisted by their respective counsel. Attorneys for DCF and the minor child, and an attorney who served as the children's guardian ad litem, represented their clients. CT Page 10559
Wendy M. testified in support of her motion, and also introduced testimony from the following witnesses:
1. Scott Moore, a licensed family therapist;
 2. Rachel Cullinane, M.S.W., a licensed clinical social worker; at the Children's Center in Hamden;
3. Deborah Sheldon, DCF social worker;
4. Antonio Rozie, DCF social worker;
 5. Russell J. Harrington, M.S.W., a licensed alcohol/drug counselor and social worker at Elmcrest Hospital;
6. Mark S., Wendy M.'s boyfriend.
The mother offered two written documents into evidence: a letter from Scott Moore under date of April 26, 1999 (Respondent Mother's Exhibit 1) and a letter from Ann C. Tuller, M.A., president of AMPS, Inc., which was dated July 22, 1999. (Respondent Mother's Exhibit 2).
Dr. Ronald D. Anderson, a licensed clinical psychologist who conducted a court-ordered evaluation in this matter during the summer of 1998, testified at hearing for the petitioner. His comprehensive report of that psychological evaluation (Petitioner's Exhibit B) was entered into evidence,[2] as was a copy of Mark S.'s record of arrests from the Connecticut Department of Public Safety's State Police Bureau of identification. (Petitioner's Exhibit A).
 FACTUAL FINDINGS
The court has carefully reviewed and considered all of the evidence and testimony presented at hearing, and finds the following facts were proven by a preponderance of the evidence:
Steven (d.o.b. April 24, 1987) and Frankie (d.o.b. September 16, 1988) were committed to the petitioners care and custody as neglected and uncared for children on August 31, 1998. Frankie, who is emotionally disturbed and has learning disabilities, has been a resident at the Children's Center in Hamden since October 16, 1998. Clinicians there believe that Frankie no longer needs CT Page 10560 residential placement and have recommended since February of this year that the child be placed in a foster home. (Testimony of Rachel Cullinane). Steven is currently in a foster home. Both children have been in the state's care since DCF received ex parte orders of their temporary custody in January 1998.
DCF became involved with the children following a domestic violence incident at their home in early December 1997. On that occasion, Mark S., the respondent mother's boyfriend, got into an altercation with Steven. Mark S. held Steven on the floor, stuffed crumpled paper into his shirt, lit another piece of paper on fire, and threatened to set Steven ablaze. (Petitioner's Exhibit B, Page 2). Mark S., who has a long-standing history of alcohol abuse, had been drinking prior to this incident. (Petitioner's Exhibit B, Page 2). Wendy M. was present, intervened, and took the lit piece of paper away from Mark S. The police were called and Mark S. was arrested. The altercation was witnessed by Frankie, who has a history of fire setting. At the time of the incident, both boys were in the custody of Wendy M., who had separated from the children's father, Francis M., during the summer of 1997. (Petitioner's Exhibit B, Page 12).
Wendy M. subsequently signed a service agreement with DCF in which she promised that her boyfriend would not be allowed in the home, or have unsupervised contact with either child, until it was determined that the children would not be at risk in Mark S.'s presence. (Petitioner's Exhibit B, Page 2). The mother also obtained a protective order that prohibited Mark. S. from consuming alcohol in her home. (Petitioner's Exhibit B, Page 2). It was subsequently alleged that Mark S. had continued to drink intoxicating beverages in Wendy M.'s residence, and had resumed living there. (Petitioner's Exhibit B, Page 2). Mark S. was arrested for violation of the protective order, and DCF removed Steven and Frank from their mother's care pursuant to the order of temporary custody.
On June 30, 1998, Mark S. was convicted on charges of threatening and violation of a protective order.[3]
(Petitioner's Exhibit A, Page 3). He received a total effective sentence of two years' incarceration, execution suspended, and two years' probation. (Petitioner's Exhibit A, Page 3).
During the court-ordered psychological evaluation in the summer of 1998, Mark S. explained his actions in threatening to set Steven on fire. Dr. Ronald D. Anderson's report indicates: CT Page 10561
 "With respect to the incident in December, involving his girlfriend's children, Mark recalled that he had been painting inside of the house all day and "started drinking." His girlfriend's younger son, Frankie, had problems with setting fires, so that when Mark saw him walk out of his bedroom with a lighter, he "basically went off." He "yelled at him," and wrestled with the child's older brother. He stuffed paper into the older boy's shirt, and said: "You want to see what fire's like." (Petitioner's Exhibit B, Page 44).
Mark S. admitted during his testimony at this hearing that he stuffed paper in Steven's shirt and lit another piece of paper on fire. He testified that he had consumed a few beers that night. He claimed that he was trying to teach Frankie a lesson about playing with fire, and stated that he later apologized to Steven for his conduct. Mark S. also testified that when he was a child, his own father taught him a similar lesson by placing his (Mark's) hands on a stove.
The court finds Mark S.'s conduct during the incident in December 1997, and his subsequent attempts to explain it, to be evidence of his seriously flawed judgment, and of his insensitivity to the trauma and danger which he caused for both of Wendy M.'s children. Dr. Anderson evaluated Mark S. during the summer of 1998, more than six months after the boyfriend's altercation with Steven. Dr. Anderson concluded then that Mark S. possessed only a limited understanding of how children behaved, lacked insight about the effect which his hostility had on others, and was minimizing both the December 1997 incident, and his alcohol abuse. (Petitioner's Exhibit B, Pages 43, 46 and 47). The psychologist's August 18, 1998 report recommended:
 "At present, there is a substantial risk that [Mark S.] would continue to have a detrimental impact upon his girlfriend's children, and any future contact with them should be closely supervised." (Petitioner's Exhibit B, Page 47).
The court found Dr. Anderson's testimony and written report to be highly credible, and accepts the forgoing observations and opinions as fact.
The evidence at this hearing established that Wendy M. also CT Page 10562 minimizes the seriousness of Mark S.'s conduct, and the impact which it had on both Frankie, who is emotionally disturbed and has a history of fire-setting, and Steven. Dr. Anderson noted in his report:
 "In this context, it is remarkable that Wendy did not appear more alarmed about the incident in which her boyfriend stuffed paper into the shirt of her oldest son, and held him to the ground, and threatened to set him on fire with a piece of burning newspaper he held by the child's head. This is an appalling instance of emotional and physical abuse, and although Wendy reportedly intervened to put out the fire on the piece of paper which her boyfriend held, she clearly could and should have intervened earlier. That she minimized the impact of that incident and rationalized her boyfriend's alcohol abuse raises questions about her stated concerns that her ex-husband was verbally abusive to the children. It is not at all clear that the welfare of the children is her main priority." (Petitioner's Exhibit B, Page 23).
The psychologist concluded that Wendy M.'s ". . . lack of insight and weak parenting skills raise serious questions about her ability to provide proper care for her children under the best of circumstances." (Petitioner's Exhibit B, Page 23). Dr. Anderson also opined that the mother did not recognize Frankie's serious emotional disturbance and treatment needs, and did not "appear to be at all capable of providing the level of reward-based structure, care and supervision needed by a child with serious intellectual and emotional problems." (Petitioner's Exhibit B, Page 23). The psychologist testified at hearing that he concluded during the evaluation last summer that Wendy M.'s loyalties to her children and her boyfriend were "too mixed," and that the mother could not adequately protect the children from Mark S. Because of the mother's conflicted loyalties and weak parenting skills, the psychological evaluator did not recommend then that either child be returned to Wendy M.'s home. (Testimony of Dr. Anderson). The court accepts Dr. Anderson's opinions and conclusions concerning Wendy M. as fact.
When Steven and Frankie were committed to DCF on August 31, 1998, court-approved expectations were signed by the respondent parents. Wendy M. agreed to obtain and cooperate with a CT Page 10563 restraining order keeping Mark S. out of her home. (Testimony of Antonio Rozie). Despite that agreement, the admonition of DCF, and the professional opinion rendered by Dr. Anderson in August 1998, Wendy M. still resides with Mark S. The respondent mother admitted during her testimony at hearing that Mark S. has lived with her from June 30, 1998 to the present. (Mark's daughter, Jennifer S., also resides in the home). Wendy M. acknowledged the existence of the court expectation mandating that she cooperate with a restraining order against her boyfriend, but claimed that she signed it only because her prior counsel informed her that she would risk a termination of her parental rights if she didn't do so.
On August 2, 1998, Mark S. was arrested again at Wendy M's home for a domestic violence incident involving his daughter. Jennifer. Wendy M. testified that Mark S. had also been drinking on that occasion.
During her interview with Dr. Anderson last summer, Wendy M. stated that she would not leave Mark S., even if doing so was in the best interests of her children, because she had developed a close relationship with Mark's daughter, Jennifer. At hearing on July 26, 1999, Wendy M. testified that "if it came down to it" she would tell Mr. S to leave the home, although not for an indefinite period of time. However, she also asserted that she does not believe that Mark S. is a threat to her children, and claimed that her boyfriend has not been intoxicated in their home since his arrest for the August 2, 1998 domestic violence incident. The court does not ascribe great weight to this testimony by the mother. Wendy M.'s conduct during the past year — when she remained with Mark S. despite the knowledge that this choice would impede her reunification with Steven and Frankie — casts doubt upon the respondent's words.
Wendy M. currently has supervised visits with Steven and Frankie. DCF imposed this requirement on April 7, 1999, after an administrative hearing. Prior to that, the mother's visitation suspended since December 1998, when Wendy M. made a threatening remark to her social worker[4]. Since April, the visits have been supervised by the staff of an agency known as AMPS Inc. in Vernon. The visits have gone well, and Wendy M. displayed positive parenting skills during the contacts with her children there. (Mother's Exhibit 2). In a letter dated July 22, 1999, Ann C. Tuller, the president of AMPS, indicated that a close bond existed between the children and Wendy M., and that they respond CT Page 10564 to her. (Mother's Exhibit 2, Page 2). The court accepts those observations as fact. In her letter, Ms. Tuller states: "We have had almost no input from the Department of Children and Families with regard to why the children were removed from Wendy's care although they have shared with us that Wendy threatened her social worker, Antonio Rozie. (Mother's Exhibit 2, Page 2). Ms. Tuller also indicated in her correspondence that Wendy M. no longer needed supervised visits, and that the mother did not appear to pose a physical or emotional risk to Steven and Frankie. Mother's Exhibit 2, Page 2). DCF disagrees with those recommendations. Based on the lack of information provided to AMPS concerning the reasons for the neglect adjudication, and the issues pertaining to the respondent's relationship with Mark S., the court does not accept those conclusions.
As indicated above, Wendy M. made a threatening remark to Social Worker Antonio Rozie last December. The relationship between the respondent and the social worker is obviously strained, and Mr. Rozie's last visit to the mother's home occurred in March 1999. (Testimony of Antonio Rozie).
The mother began counseling with Scott B. Moore, a licensed family therapist, on December 21, 1999 and had seen him 15 times as of April 26, 1999. (Mother's Exhibit 1). However, as of the date when this hearing began, DCF did not have complete information about the nature of that treatment, since Wendy M. resisted signing "full releases" for the agency to communicate with her therapist.
It was established at hearing that Mark S. is on probation, and submits to alcohol screens on a monthly basis at the direction of his probation officer. There was no testimony from a probation officer at hearing as to the results of that testing. Russell Harrington, a licensed alcohol and drug abuse counselor who is employed by Elmcrest Hospital, testified that Mark S. has been participating in weekly group therapy with him for approximately the past year, and attended approximately 80 per cent of the scheduled sessions during that period. Prior to enrolling in the group sessions, Mark S. received more intensive outpatient treatment through an Elmcrest program called Team Works. Mr. Harrington's program does not conduct substance abuse screening of its clients. Wendy M. testified at this hearing that Mark S. "is fighting" his alcohol abuse problem.
The children's father. Francis M., has been compliant with CT Page 10565 DCF and the court-approved expectations. He successfully completed a parenting class, and has had unsupervised, overnight visits with the children, which have been without incident. He has been involved in family counseling with the children. Although DCF is seeking extension, its eventual goal is to reunify both of the children with Francis M. However, in both his written report and his testimony at hearing, Dr. Anderson expressed serious reservations about Francis M.'s ability to function as the sole custodian parent of Steven and Frankie. Dr. Anderson noted in his August 1998 report:
 "While [Francis M.] would like to provide an adequate home for his children, it is almost certainly beyond his present means to do so." (Petitioner's Exhibit B, Page 34).
Dr. Anderson concluded last summer that the father has a limited understanding of children and displays weaknesses in his childcare abilities. (Petitioner's Exhibit B, Page 34). The psychologist also found that the father had borderline intellectual functioning, lacked a good relationship with the children and good child communication skills, and would not be effective at communicating feelings of warmth and concern to the two boys. (Petitioner's Exhibit B, Page 34). Dr. Anderson opined that Francis M. did not appear able to provide the highly structured, well-supervised, non-punitive and reward-based environment which Steven and Frankie will require. The psychologist also wrote that Francis M.'s . . . intellectual and emotional limitations are significant obstacles to his ability to rescue his children."
Dr. Anderson testified that with therapy, parenting education, and other assistance, it might take four or five years before Francis M. could assume sole custodial responsibility for the children. The psychologist also testified that in order to have the children returned to the father's home in the near future, Francis M. would have to establish residency with a responsible adult who would actively assume joint parental responsibility for Steven and Frankie. Dr. Anderson believes that both children need intensive supervision and a non-punitive, reward-based, highly structured home environment. The psychologist testified that the father's intellectual and emotional limitations, his lack of parenting skills and insight about the children's needs, and his work schedule would prevent him from currently fulfilling these important needs, unless the father allied himself with another adult who could shoulder many CT Page 10566 of the day-to-day care taking and parenting responsibilities for the boys. The court accepts Dr. Anderson's opinion as fact.
The evidence at hearing established that both Steven and Frankie regard their mother as their psychological parent. (Testimony of Dr. Anderson). The children still have a close emotional bond with their mother, and their relationships with Wendy M. are much stronger than the ties which they have to Francis M. Both children would prefer to be reside with their mother, but have also indicated that they would like to live with their father if reunification with Wendy M. is not possible.
In his August 1998 report, Dr. Anderson recommended that the children not be returned to either parental home, and further recommended that Frankie and Steven should remain committed to DCF for at least another year. The court is mindful that the evaluation is now one year old, and has not been updated during the past 12 months. However, having heard all of the evidence and testimony in this case, including facts pertaining to the activities and adjustment of the adults and children in this matter during the past year, the court finds that Dr. Anderson's professional opinions are still applicable to the family's present situation, and, accordingly, ascribes them great weight.
 ADJUDICATION
In a hearing on a motion to revoke commitment, the moving party has the burden of proving by a fair preponderance of the evidence that no cause for commitment exists. If that burden is met, the opposing party then has the burden of showing by a fair preponderance of the evidence that revocation would not be in the best interest of the child. (Connecticut Practice Book, Section 33-10). Extension motions are dispositional in nature, based on the prior adjudication. The judicial authority must determine, based upon a fair preponderance of the evidence, whether an extension of commitment is in the best interest of the child. (Connecticut Practice Book, Section 33-9).
The court finds that neither child can be restored to the care and custody of either of their parents at the present time. Mark S. was physically abusive to Steven, and psychologically abusive to both boys, during the disturbing incident in December 1997. The evidence presented by the mother at this hearing did not establish that Mark S. has conquered his anger or his alcoholism, or that he would not presently pose a risk of CT Page 10567 physical or emotional harm to Steven and Frankie. Despite that risk, and despite the prior admonitions of the court, DCF, and various professionals, the mother has continued to reside with Mark S. The evidence at hearing proved that the mother continues to place her needs above those of her children, and for that reason can not adequately protect them. Both Wendy M. and her boyfriend still lack insight about the significance of Mark S.'s actions, and both continue to minimize the harm caused by those actions. Wendy M. has further impeded reunification by being hostile to her social worker, and by failing to cooperate with requests that she provide DCF with information about her therapy and rehabilitative efforts since the date when the children were committed. The court finds that Wendy M. and Francis M. still have serious deficits in their parenting skills, in their recognition of the children's special needs, and in their abilities to provide a structured, and non-punitive home environment for Steven and Frankie.
For all of the forgoing reasons, the court finds that Wendy M. has failed to prove by a fair preponderance of the evidence that no cause for commitment exists. The respondent's motion for revocation of commitment is hereby DENIED.
Because the court finds that the respondent did not establish that Mark S. no longer poses a risk of physical or emotional harm to Steven and Frankie, the court also finds by a preponderance of the evidence that there has been no material change in circumstance with respect to the August 31, 1998 court-approved expectation requiring Wendy M. to cooperate with a restraining order against Mark S. Therefor, the respondent's motion to modify that condition is DENIED.
DCF has proven by a fair preponderance of the evidence that the commitment of each child to the care and custody of the Commissioner of the Department of Children and Families is in the best interest of each child. The petitioner's motions to extend commitment are hereby GRANTED. The commitments of Steven M. and Francis ("Frankie") M. are each hereby extended for a period not to exceed 12 months, effective August 31, 1999 through August 31, 2000. The court finds that prior to this extension, DCF made reasonable efforts to reunify each child with both parents.
The petitioner has also requested that this court make findings that further efforts to reunify the children with Wendy M. are no longer appropriate, and that further efforts to reunify CT Page 10568 Steven and Frankie with Francis M. are still appropriate. DCF has indicated that its eventual plan is to reunify the children with the father. The court has serious reservations about that plan, and cannot presently approve it. Dr. Anderson concluded that despite the father's interest in the children and his commendable efforts to reunify with them, Francis M. has intellectual, emotional and parenting deficits which are so extensive that he is likely to need the full-time assistance of another responsible adult who will have to shoulder much of the responsibility for the supervision, care and parenting of both Steven and Frankie. The court has accepted that opinion. This is not merely a requirement that Francis M. find day care for his sons. Instead, it is requirement that he develop an alliance with a qualified adult who will jointly assist him in parenting two emotionally troubled children. There was no evidence at hearing that Francis M. will overcome his personal limitations in the near future, or that he has a workable plan for conjoint parenting. It is also clear that he does not have a close bond with either Steven or Frankie at present.
Wendy M. also has significant limitations in her parenting skills, and has demonstrated the tendency to elevate her own needs, and her relationship with Mark S., above the needs of her children. However, she still enjoys a warm bond with Steven and Frankie, and both children would prefer to live with her.
With the forgoing considerations in mind, the court finds by a preponderance of the evidence that further efforts to reunify the children with both parents are still appropriate, but only for a limited period of additional time, which should not exceed six months.
Based on the evidence considered by this court, the court believes that reunification with Wendy M. can be achieved only if she immediately complies with the following expectations:
 1. The mother must immediately establish a residence separate and apart from Mark S., and not resume residency with him, or permit her children to have unsupervised contact with him, until DCF determines that it is safe to do so;
 2. Wendy M. must demonstrate that she understands, and will meet, the specialized needs of her children, and will appropriately recognize and deal with threats to their physical and emotional well-being. To that end, she must CT Page 10569 cooperate with, and successfully complete, family therapy with both the children, and a parenting class or other program which emphasizes the area of domestic violence, and it impact on children. DCF shall forthwith identify such treatment or program, and facilitate Wendy M.'s enrollment therein.
 3. The respondent mother must cooperate with DCF by behaving civilly towards all personnel assigned to assist her, and comply with requests for authorizations and information about her rehabilitative efforts;
 4. The respondent must cooperate with an updated psychological assessment by Dr. Anderson.
 5. If Wendy M. intends to continue her relationship with Mark S. she must secure Mark S.'s cooperation in the following:
 a. Providing DCF substantiated documentation that he is actively involved in substance abuse treatment, and is remaining alcohol and
 b. Providing DCF substantiated documentation that he is in compliance with the terms of his probation and has not engaged in any further acts of domestic, or other, violence.
 c. Providing DCF substantiated documentation that he has successfully completed anger management therapy or a domestic violence program, and demonstrating that he has internalized the lessons learned therefrom.
 d. Cooperation with an updated psychological assessment by Dr. Anderson.
The court believes that reunification with Francis M. can only be achieved if he immediately meets the following expectations:
 1. The father must establish a workable plan in which he identifies a responsible person who will assist him in jointly parenting the children, and clearly indicate how this plan will be implemented.
 2. Francis M. must continue to cooperate with therapy and programs intended to help him meet Steven and Frankie's needs, CT Page 10570 and to improve his parenting skills. DCF shall forthwith identify such treatment or programs, and facilitate Francis M.'s enrollment therein.
 3. The father must cooperate with an updated psychological evaluation by Dr. Anderson.
The court respectfully recommends to the Presiding Judge of the Superior Court for Juvenile Matters in Rockville that the court direct the parties to meet in a case status conference and agree upon amended court-approved expectations consistent with this decision. The court respectfully recommends that the Court order an updated psychological evaluation by Dr. Anderson of the parents, the children and Mark S., if he is willing to cooperate. The undersigned respectfully recommends that the Rockville court schedule an in-court judicial review of the parents' efforts to reunify approximately six months from the date of this decision. If the court finds at that time that reunification with the biological parents is unlikely to occur, the court should consider ordering DCF to immediately pursue a long-term permanency plan of long-term foster care for these children, and should also consider making findings that any further efforts to reunify are no longer appropriate.
The court respectfully recommends to the Commissioner of the Department of Children and Families that it follow the recommendation of the Children's Center and place Frankie in a structured foster home at this time. The court recommends that DCF consider expanding the scope of respondent mother's visitation with both children if she demonstrates immediate compliance with the expectations detailed above.
Finally, this court orders DCF to comply with the protocol and timetable established by the Superior Court for Juvenile Matters in Rockville with respect to the filing of, and hearings on, further motions to revoke or extend these commitments.
SO ORDERED:
Dyer, J.